2003 ME 109

**George BRACKETT et al.**

v.

**TOWN OF RANGELEY et al.**

Supreme Judicial Court of Maine.

Argued: Sept. 10, 2002.
Decided: Aug. 25, 2003.

David C. Pierson, (orally), Hark Andrucki, Lewiston, for plaintiff.

Stephen E.F. Langsdorf, (orally), Preti Flaherty Beliveau Pachios & Haley, LLC, Portland, for Town of Rangeley.

Peter Clifford, (orally), Hodsdon & Clifford, LLC, Kennebunk, for William Sears.

Panel: SAUFLEY, C.J., and RUDMAN, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

Concurring: ALEXANDER, J.

DANA, J.

[¶ 1] George and Roselyn Brackett (the Bracketts) are, as we say in Maine, "from away." When, on the Fourth of July weekend in 1999, they returned to their summer camp on Rangeley Lake for the first time that year, they discovered that

their next-door neighbor, William Sears, had, in multiple violation of the Town's Zoning Ordinance and without the required hearing with notice to his neighbors but with the blessing of the Town's Code Enforcement Officer, replaced his non-conforming cottage with a substantially larger but even more non-conforming dwelling. Although the Bracketts filed an appeal to the Zoning Board of Appeals within thirty days of their actual notice of Sears's construction, the Board ultimately concluded that the Bracketts' appeal was untimely and that under the circumstances, they were not entitled to relief from the Ordinance's thirty day appeal period.[1] We disagree, vacate the judgment of the Superior Court (Franklin County, *Gorman, J.*) affirming the Board's finding, and direct that the court remand this matter to the Board to entertain the Bracketts' appeal.

## I. BACKGROUND

[¶ 2] The Bracketts and Sears own cottages on abutting land on Rangeley Lake in the Town of Rangeley. New Hampshire residents, the Bracketts use their cottage on Rangeley Lake only during the summer.

[¶ 3] In 1997, when Sears purchased his property, it included an old cottage (original cottage), a "nonconforming structure" within the Rangeley Shoreland District. *See* Rangeley, Me., Zoning Ordinance §§ 9(B)(51), 9(B)(70) (May 28, 1987, amended Jan. 5, 1998, and June 9, 1998). Being about forty feet back from the lake's high water mark and six feet from the Bracketts' property line, Sears's original cottage violated two zoning requirements: it was situated less than 100 feet from the lake's high water mark, *see id.* §§ 9(B)(53), 9(B)(69), and it did not meet the twenty-foot side setback requirement from the property line with the Bracketts. *See id.* § 4(G).

[¶ 4] During 1998, Peter Farnsworth, the Town's Code Enforcement Officer (CEO), granted Sears three building permits for work on the original cottage:

- On May 28, 1998, a permit to construct a deck;
- On September 29, 1998, a permit to demolish and reconstruct the part of the original cottage nearest the lake; and
- On November 3, 1998, a permit to demolish the original cottage and replace it with an entirely new cottage (new cottage).[2]

---

1. The Town of Rangeley's Zoning Ordinance provides:

   In all appeals cases, a person aggrieved by a decision of the Code Enforcement Officer shall commence his appeal within 30 days after a decision is made by the Code Enforcement Officer. The appeal shall be filed with the Board of Appeals on forms approved by the Board, and the aggrieved person shall specifically set forth on the form the grounds for the appeal.

   Rangeley, Me., Zoning Ordinance § 7(A) (May 28, 1987, amended Jan. 5, 1998, and June 9, 1998). The Bracketts appealed on the approved form on July 30, 1999, approximately nine months after the November 3, 1998 permit was issued.

2. Looking at Sears's permitting history, the Superior Court (Franklin County, *Gorman, J.*) determined:

   The copy of the November 1998 permit included in the Record did not have the required site plan attached to it. The site plan Mr. Sears provided with his application for the first permit gave the dimensions of the old cottage as 16.5' × 48.5'. *It is not entirely clear that those measurements are accurate.*

   The proposal submitted by Mr. Sears in his November request contemplated the demolition of the existing building, and the construction of a new building with 1,036 square feet of living area. *As presented, the request was not within the jurisdiction of the CEO. The proposed expansion exceeded the 30% limit. If the CEO had denied the per-*

The Bracketts received no notice of any of these permits. If Sears's application for the November 3 permit had been processed properly, however, it would have gone before the Town's Planning Board and the Bracketts would have been notified of Sears's application for the permit. *See id.* §§ 7(C),(D).

[¶ 5] In October 1998, Sears began work pursuant to the September 29 permit. The Bracketts closed their cottage for the winter on October 18, 1998. They testified that they were unaware of any construction at all on the Sears property that fall.

[¶ 6] After Sears began work pursuant to the second permit, he concluded that the extent of the floor timber rot in the original cottage precluded renovation and he decided to build a new cottage instead. Sears demolished the original cottage in April 1999 and began building the new cottage in mid-May. By July 2, the new cottage foundation was complete and by July 30, the walls were framed and sheathed. The Bracketts observed these changes for the first time when they returned to Rangeley on July 3, 1999. Until then, they had been unaware of the November 3 permit and Sears's plan to replace the original cottage.

[¶ 7] As soon as they saw Sears's construction, the Bracketts met with Robert Griscom, the Town's new CEO, and complained about the new cottage, asking him to halt construction and to revoke the November 3 permit. He refused and did not tell them they needed to file an appeal on any particular form.

[¶ 8] On July 8, George Brackett wrote a detailed letter to the Town's Board of Selectmen (with a copy to Griscom but not Sears) asking the Board to revoke the November 3 permit and stop construction because the new cottage violated the requirements of the Town's Zoning Ordinance for Shoreland District construction. Although it was not on the required form, Brackett's letter contained all the information necessary for filing an appeal. There is no indication, however, that the Town informed Sears of Brackett's request. The CEO still did not notify the Bracketts that they needed to file an appeal with the Zoning Board of Appeals or that the appeal needed to be on a particular form. Receiving no response to this letter, the Bracketts went to the Town Office on July 27 and learned that the selectmen had not considered George Brackett's letter because they had not met since receiving it. The person with whom the Bracketts spoke suggested that they raise their concerns with the selectmen directly at their scheduled meeting that night. Upon doing so, the Bracketts were told for the first time to file an appeal on the Zoning Board of Appeals's approved form. They did so on July 30, challenging Sears's November 3, 1998, permit.

[¶ 9] On August 27, 1999, the Board held a public hearing on the Bracketts' appeal

---

*mit, as he should have, Mr. Sears could have requested a variance from Zoning Board of Appeals (ZBA), pursuant to Section 8(D) of the Ordinance.* In addition, the proposed reconstruction included a lateral expansion that required review by the Planning Board. Finally, there is at least an argument that the project should have been deemed "new construction" because it included a complete removal of the old structure. New structures may only be approved if they conform to all setback requirements.

Before making a decision on Mr. Sears'[s] requests, either the Planning Board or the ZBA would have been required to hold a public hearing. *These Boards must also notify those citizens who might be interested, including the property owner making the request, and all abuttors [sic], that the proposal will be discussed at a public hearing.* Ordinances §§ 7(C) and (D).
No such notice is required for permits that are within the jurisdiction of the CEO. (emphasis added).

and, according to the minutes, voted to "send this back to the Planning Board for their approval, and [to have] the square footage be brought into the 30% expansion rule." On September 9, however, the Board met again, reconsidered its August 27 decision,[3] and voted instead to dismiss the Bracketts' appeal.

[¶ 10] In its letter to the Bracketts, the Board stated that the building authorized by the November 3 permit exceeded the allowable 30% expansion by 100 square feet and that "[t]he lateral expansion of the building, a non-conforming structure, was not approved by the Planning Board as required by sect. 3(C)1b of the Zoning Ordinance." Nevertheless, the letter stated that Board dismissed the Bracketts' appeal because:

1. The appeal was not filed in a timely manner.[4] The permit was issued to Mr. Sears on Nov. 3, 1998. Construction

commenced in April, 1999 and Mr. Brackett filed his appeal on July 30, 1999.

2. Mr. Sears has a vested interest in the permit.

3. Mr. Sears acted in good faith in accordance with the permit.

[¶ 11] Pursuant to M.R. Civ. P. 80B, the Bracketts appealed from the Board's decision, asking the Superior Court (*Marden, J.*) to decide whether the Board had acted legally at its September 9, 1999, meeting and whether Sears's November 3 permit was consistent with the Town's Ordinance. In March 2001, the court vacated the Board's September 9 decision and remanded the matter to the Board "to find facts necessary to determine whether a good cause exception to the thirty day appeal period is applicable...."

[¶ 12] In May 2001, the Board concluded that the Bracketts did not satisfy the good

---

**3.** Section 7(B)(1) of the Rangeley Zoning Ordinance provides: "A Board member who voted on the prevailing side of the decision may move to reconsider at any time within [the] 30–day period." Rangeley, Me., Zoning Ordinance § 7(B)(1) (May 28, 1987, amended Jan. 5, 1998, and June 9, 1998).

**4.** The Board itself, however, appears unclear as to when the thirty day appeal period actually begins. For example, at the September 9, 1999 Board Meeting, Chairman Jani stated:

I really don't think that the appeal was filed in a timely manner. The Ordinance says thirty days .... Then it says, an appeal is timely when an adjacent landowner appeals from the granting of a permit *within thirty days after he learns of the issuance through commencement of construction.* Mr. Sears started construction in April. I don't think you can come in two or three months later.

(emphasis added). The meeting transcript also contains this exchange between Jani and Board member Emory:

Emory: The thirty days, to me, is debatable.
Jani: Well, it is. I think if he were to come in in April, if he would've come in by the end of April, and said, hey stop the con-

struction and then, I think he would have had a case. But to come in at the end of July, or even the beginning of July, after it's been in construction for two to three months, I think that's not timely.
Emory: Well, I agree if he was notified. But see he was not...
Jani: He was notified through the commencement of construction.
Emory: Was he? I don't know ....
Jani: By the construction, he should have been notified.

and this statement by Board member Mrs. Hodge:

I'll make a motion to deny (Mr.) George E. Brackett's appeal due to the time limit, thirty days from the, *four months actually,* it was.

(emphasis added). Moreover, among the Board's Legal Conclusions in its May 23, 2001 order denying the Bracketts' appeal is this:

Since the Bracketts were in possession of the current ordinance which sets forth a 30–day appeals period as of July 8, 1999, it was unreasonable for them to have waited until July 30, 1999 to file an appeal with the ZBA. This delay alone justifies a finding of no good cause to exceed the 30–day period.

cause exception to the thirty day rule because "there were no facts which indicated that there were 'special circumstances which would result in a miscarriage of justice' unless the time limit was extended." The Board explained,

1. Before they left for New Hampshire in October, the Bracketts were on actual or constructive notice of the work described in the November permit;

2. Sears had vested rights in the November permit; and

3. The Bracketts' twenty-seven day delay before filing their appeal was too long.

[¶ 13] In January 2002, the court, while rejecting the first two arguments,[5] found merit in the third and affirmed the Board's decision. This appeal followed.

## II. DISCUSSION

[¶ 14] The Bracketts contend first that, in light of the special circumstances of their case and consistent with the principles established in *Keating v. Zoning Board of Appeals of Saco*, 325 A.2d 521, 524 (Me.1974) and *Gagne v. Cianbro Corp.*, 431 A.2d 1313 (Me.1981), a "flagrant miscarriage of justice" will result unless they are granted a "good cause exception." They assert, further, that the presence of a designated appeal period in the Rangeley Ordinance should not preclude an application of the good cause exception. We agree with both propositions.

### A. The Standard of Review

[¶ 15] "Interpretation of the provisions of a zoning ordinance is a question of law for the court. Therefore, we review such questions de novo." *DeSomma v. Town of Casco*, 2000 ME 113, ¶ 8, 755 A.2d 485, 487 (citation and quotation omitted). When a zoning board of appeals acts as the tribunal of original jurisdiction as both fact finder and decision maker, we review its decision directly for errors of law, abuse of discretion, or findings not supported by substantial evidence in the record. *Yates v. Town of Southwest Harbor*, 2001 ME 2, ¶ 10, 763 A.2d 1168, 1171. Thus, we review directly the May 23, 2001 decision of the Rangeley Zoning Board of Appeals.

[¶ 16] We construe an ordinance in accordance with its objectives. *Griffin v. Town of Dedham*, 2002 ME 105, ¶ 10, 799 A.2d 1239, 1243. "The underlying policy of zoning is to gradually eliminate nonconforming structures and uses.... The accepted legal standard has been to strictly construe zoning provisions relating to the extension, expansion or enlargement of nonconforming buildings...." *Lewis v. Me. Coast Artists*, 2001 ME 75, ¶ 26, 770 A.2d 644, 653 (citations and quotation omitted). Conversely, zoning regulation "provisions limiting nonconforming uses should be liberally construed." *Oliver v. City of Rockland*, 1998 ME 88, ¶ 9, 710 A.2d 905, 908 (citation and quotation omitted).

---

5. The Superior Court found the first argument "seriously flawed" and rejected it, stating:

> The information presented by this record can *only* support a finding that the Bracketts had no actual or constructive notice of the November 3, 1998 permit until their arrival in Rangeley on July 3, 1999. Nothing that happened before the issuance of a permit may be construed to give notice of that permit.

*Id.*

The court also rejected the Board's second argument, because, as the Board had explained in its September 1999 letter, "the ZBA had already determined that Mr. Sears' house, as constructed, violated the Town's Ordinance in several ways. Therefore, the ZBA erred in 2001 when it determined that Mr. Sears had 'vested rights' in the nonconforming structure pursuant to Section 3(G) of its Ordinance." *Id.*

■ [¶ 17] Although we review most factual determinations of an administrative body deferentially, *Imagineering, Inc. v. Superintendent of Ins.*, 593 A.2d 1050, 1053 (Me.1991), we have decided that the application of the good cause exception is a decision to be made "judicially, rather than administratively, to prevent local arbitrariness," *Gagne v. Lewiston Crushed Stone Co., Inc.*, 367 A.2d 613, 619 (Me.1976).

B.   Whether there would be a "flagrant miscarriage of justice" if the Bracketts are not entitled to a good cause exception.

■ [¶ 18] Because the Town violated its own ordinance in its approval of Sears's permit, Sears violated the terms of the permit he received, and the Bracketts acted in a timely and appropriate fashion upon discovering these violations, it would be a "flagrant miscarriage of justice" to deny on timeliness grounds their appeal.

1.   The Town's violation of its own Ordinance

[¶ 19] Sears's original cottage was a non-conforming structure within the Rangeley Shoreland District: it was closer than twenty feet from a sideline and closer than 100 feet from the shore. *See* Rangeley, Me., Zoning Ordinance §§ 4(G), 9(B)(51) (May 28, 1987, amended Jan. 5, 1998, and June 9, 1998). As a proposed expansion of a non-conforming structure, Sears's application required Planning Board review and approval. *See id.* § 3(C)(1)(b), 3(C)(1)(c). It received neither. Before granting the permit, the Planning Board would have had to give the Bracketts notice before it held a hearing. *See id.* § 7(C)(D). The Board gave no notice and held no public hearing on Sears' application. The Board itself acknowledged at its September 9, 1999, meeting that if Sears's application for the November 3 permit had been prop-

erly processed, it would have gone before the Town's Planning Board, the Planning Board would have had a public hearing, and the Bracketts would have been notified.

2.   Sears's new cottage violations

[¶ 20] The cottage Sears built violated even the terms of the improperly granted November 3 permit. First, while the permit expressly requires Sears to construct the new cottage forty-eight-plus feet from the shore, he knowingly constructed it thirty-eight to forty feet from the high water mark. Further, the new cottage violated the 30% rule even more than the unauthorized permit allowed. The new cottage had a 348 square foot deck, which was not accurately described on the November 3 application or in the attached sketch. Sears did not include the deck in his own calculations of the floor area; furthermore, the new cottage has a full basement, which adds to the square footage and volume.

3.   Timeliness of the Bracketts' appeal

[¶ 21] The Bracketts appealed within thirty days their of actual knowledge. Contrary to the Board's finding, the Bracketts did not spend this period simply deciding whether to appeal and they *did* make their objections known to the Town almost immediately. While the uncontroverted evidence shows that the Town and CEO Griscom did nothing between July 3 and 30, 1999, the Bracketts acted diligently and reasonably to perfect their appeal:

● On July 3, when they discovered the foundation for the new cottage, the Bracketts immediately met CEO Griscom, asking him to stop the construction and revoke the November 3 permit. Griscom declined to take any action and failed to tell the Bracketts how to file an appeal.

• On July 8, George Brackett wrote to the Town's Selectmen (with a copy to CEO Griscom), outlining Sears's violations of the Ordinance and requesting them to revoke the permit and stop construction. Neither the Selectmen nor Griscom responded. While the letter was not on the required appeal form, it included all information necessary for an appeal. Thus, the Town was on notice within a week of actual notice.

• Continuing to pursue the matter, on July 27, the Bracketts went to the Town Office. They were told that they could attend the Board of Appeals meeting that night to raise their concerns directly with the Board.

• When they did so, the Board told them to file their appeal on its designated form.

• They filed their appeal on the designated form on July 30, 1999.

Thus, the Bracketts would have filed their appeal on the correct form weeks earlier but for the fact that the CEO and the Town ignored their repeated efforts to appeal the matter.

D. Whether on the facts of this case, the Bracketts are entitled to the good cause exception despite the existence of a designated appeal period.

■ [¶ 22] We next consider whether on these facts, there is a good cause exception to the thirty day appeal period set forth in a town's ordinance.

[¶ 23] In *Keating*, when the town's ordinance did not specify a time period for an appeal, we fixed a sixty day period and allowed a good cause exception to that period "in those special situations in which a Court of competent jurisdiction finds special circumstances which would result in a flagrant miscarriage of justice unless, within a narrowly extended range, a time longer than the general norm is held 'rea-

sonable.'" *Keating*, 325 A.2d at 524. "[T]o ameliorate[ ] the predicament of potentially aggrieved persons who lack notice, we carved out the narrow 'flagrant miscarriage of justice' exception and left application of that exception to be decided judicially, rather than administratively, to prevent local arbitrariness." *Gagne v. Lewiston Crushed Stone Co., Inc.*, 367 A.2d at 618–19. Subsequently, in *Wright v. Town of Kennebunkport*, 1998 ME 184, 715 A.2d 162, we reserved for a case with different facts the question of

whether a court can grant an extension of time within which to appeal to an aggrieved party who does not have knowledge of the issuance of a permit until after the appeal period has expired in those situation[s] in which the applicable ordinance designates an appeal period but does not provide for a waiver of the limitations period upon a showing of good cause.

*Id.* at ¶ 8 n. 3, 715 A.2d at 165 n. 3.

■ [¶ 24] This is that case. When a town violates its own ordinance as to process and on the merits, equity will infer a good cause exception to an ordinance that requires a party to appeal within thirty days of the issuance of a building permit. Equity and the facts of the instant case compel us to grant a good cause exception even though the Town has a designated appeal period. In *Keating*, we created a good cause exception to ensure that justice is done when there are extenuating circumstances. In the instant case, because there are extenuating circumstances, the Board clearly erred in denying the Bracketts the good cause exception. Though the Town's Ordinance does provide for a thirty day appeal period, the Town's error precluded the use of that period, effectively rescinding it. Thus, while the appeal period existed on the books, it did not exist for the Bracketts.

■ [¶ 25] We are not unmindful of the fact that in the ordinary case, it is important for people who are about to invest substantial sums to know that they will not be sued after they expend their money. The time for litigating in ordinary cases remains prior to the start of construction. When the town violates its ordinance and the permit holder violates its permit and the abutter acts reasonably promptly, courts will recognize a "good cause exception" to a town's fixed appeal period.

The entry is:

Judgment of the Superior Court is vacated. Remanded to the Superior Court with instructions to remand to the Rangeley Zoning Board of Appeals for determination of whether Sears's new cottage violates the Town's Ordinance.

ALEXANDER, J., concurring.

[¶ 26] I concur in the result, however, I would not apply the good cause exception to extend the time period for the Bracketts to file their appeal. Consideration of the good cause exception would be appropriate only if the permits were facially valid, having been issued by the proper permitting authority, the Planning Board. The permits here were *ultra vires* acts of a person with no more authority to issue the permits than possessed by the local dog catcher.

[¶ 27] When a public officer or agency exceeds its statutory authority or proceeds in a manner not authorized by law, its resulting orders, decrees or judgments are null and void and may be attacked collaterally. *See Small v. Gartley,* 363 A.2d 724,

729 (Me.1976).[6] Such a void action may be attacked even after the time for appeal has expired. *Clough v. Newton,* 160 Me. 301, 307, 203 A.2d 690, 693 (1964).

[¶ 28] All citizens, including permit applicants and local code enforcement officers, are charged with knowledge of the law, including local ordinances. *See City of Auburn v. Mandarelli,* 320 A.2d 22, 30 (Me.1974). The construction permits, not issued by the proper authority, the Planning Board, were void the day they were issued and do not gain any validity with the passage of time. Such a void permit is subject to challenge at any time by an objecting abutter or by the town in an enforcement or a cease and desist action. *See Shackford & Gooch, Inc. v. The Town of Kennebunk,* 486 A.2d 102, 106 (Me.1984) (the unauthorized approval of a local building inspector cannot be grounds for estopping a municipality from enforcing violations of its zoning ordinance).

[¶ 29] Keeping illegal building activity from neighborly or public scrutiny, even where it may occur with the complicity of a code enforcement officer, does not grant the illegal activity immunity from appeal or enforcement as soon as some appeal period—for permits issued by another municipal body—runs. Neither the Bracketts nor the Town, nor any other individual with standing needs a good cause exception to the time for appeal to bring their challenge to these void permits.

[¶ 30] A person with a void permit issued as a result of an *ultra vires* act by a municipal official, if he or she is essentially blameless and has acted in detrimental

---

6. In *Small,* we stated:
   We agree that, if a public agency exceeds its statutory powers or, even in matters over which it has jurisdiction, proceeds in a manner unauthorized by law, its orders, decrees and judgments may be attacked collaterally as null and void, but, if within the periphery delimited by the legislative power grant, such orders, decrees and judgments, when unreversed or unmodified *in the manner provided by the pertinent legislation,* have the effect of final judgments, and they cannot be attacked before a judicial forum . . . .

reliance on the permit, may assert a defense of equitable estoppel to any enforcement or removal action. *See City of Auburn v. Desgrosseilliers,* 578 A.2d 712, 714–16 (Me.1990). However, such a defense may not apply here if Sears was aware that he was violating the law, or if, as the record appears to indicate, Sears built in violation of the invalid permit issued to him by the code enforcement officer.

[¶ 31] Accordingly, I would vacate the judgment of the Superior Court and remand to the Superior Court with direction to declare the permits at issue void.